IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DARREL REMILY and RANDAL HANSEN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No: |
| | ) | |
| FREEDOM DEVELOPMENT GROUP, LLC, an | ) | Jury Demanded |
| Illinois limited liability company; JET PARK, LLC, an | ) | |
| Illinois limited liability company; 901 CENTER | ) | |
| STREET HOLDINGS LLC, an Illinois limited | ) | |
| liability company; JET HOSPITALS LLC, a | ) | |
| terminated Illinois limited liability company; STAR | ) | |
| REAL ESTATE, LLC, a terminated Illinois limited | ) | |
| liability company; JOHN THOMAS, individually; | ) | |
| KIM DENKEWALTER, individually; and | ) | |
| DANIEL OLSWANG, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

DARREL REMILY and RANDAL HANSEN, collectively "Plaintiffs," by their attorney,

Juan M. Soliz, Esq. complain of FREEDOM DEVELOPMENT GROUP, LLC, JET PARK, LLC,

901 CENTER STREET HOLDINGS LLC, JET HOSPITALS LLC, STAR REAL ESTATE, LLC,

JOHN THOMAS, individually, KIM DENKEWALTER and DANIEL OLSWANG,

individually, collectively "Defendants," stating as follows, with all Counts hereof pled in the

alternative:

## JURISDICTION AND VENUE

1.     This is a civil action arising under the federal Racketeer Influenced and Corrupt

Organizations Act ("RICO"), at 18 U.S.C. § 1962, for a pattern of conduct using mail and wire

communications in interstate commerce to defraud lenders, service providers, individuals of

1

different states and business associates out of funds loaned and entrusted to them, and property interests to which they were entitled, and diverting such funds and interests to their own use surreptitiously, in violation of 18 U.S.C. § 1343 .

2.     Relief is also sought in the alternative under state common law for conversion, breach of fiduciary duty, breach of personal guarantee, fraud, and breach of contract.

3.     The Court has original jurisdiction of the federal claims under 28 U.S.C. § 1331, 1332 and 18 U.S.C. § 1964(c).

4.     Since the state law claims derive substantially from a common nucleus of operative fact as the federal claims, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

5.     Venue is proper under 28 U.S.C. § 1391(a) (2) and (b)(1) and (2).

## THE PARTIES

6.     DARREL REMILY ("Remily") was at all relevant times, and is currently, a resident of Turton, South Dakota.

7.     RANDAL HANSEN ("Hansen") is currently, a resident of Sioux Falls, South Dakota.

8.     FREEDOM DEVELOPMENT GROUP, LLC ("FDG") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on May 22, 2017, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

9.     JET PARK, LLC ("JET Park") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on November 2, 2017, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

10. 901 CENTER STREET HOLDINGS LLC ("901 Center") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on August 28, 2019, with its principal office at 910 W. Van Buren, Ste. 500, Chicago, Illinois 60607.

11. JET HOSPITALS LLC ("JET Hospitals") was at all relevant times, and is currently, a limited liability company formed under the laws of the State of Illinois on April 14, 2020, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

12. STAR REAL ESTATE, LLC ("Star Realty") was at all relevant times a limited liability company formed under the laws of the State of Illinois on July 3, 2013, with its principal office at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, whose status is listed by the Illinois Secretary of State as "terminated" on September 4, 2019.

13. JOHN THOMAS ("Thomas") is presently, a resident of the State of Illinois, working regularly from offices at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

14. KIM DENKEWALTER ("Denkewalter") was at all relevant times, and is currently, a resident of the City of Wheeling, in Cook County, Illinois, and is licensed to practice law in Illinois and on information and belief worked regularly on various projects, business ventures and in different capacities with FDG, Star Realty, Thomas and Olswang from their offices at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607.

15. DANIEL OLSWANG ("Olswang") was at all relevant times, and is presently, a resident of the State of Illinois, working regularly from offices at 910 W. Van Buren, Suite 500, Chicago, Illinois 60607, and is licensed to practice law in Illinois.

16. At all relevant times, Plaintiffs and Defendants, FDG, Dendewalter, and Thomas formed a contractual arrangement and joint venture partnership to purchase and resale certain

3

real estate located at 475-470 Market Ave. SW, Grand Rapids Michigan ("Grand Rapids property").

17.     At all relevant times since on or about May, 2017,  Denkewalter, Thomas and Olswang have had an ownership interest in FDG.

18.     At all relevant times, JET Park was a mere alter ego of FDG, formed by FDG's owners, which included Thomas, Olswang and Denkewalter, as FDG's designated vehicle for the purchase and resale of certain Minnesota real estate described below and referred to as the "Parking Ramp.'"

19.     At all  relevant times, 901 Center was a mere alter ego of FDG, formed by FDG's owners as FDG's designated vehicle for the purchase and operation of certain Illinois real estate which had previously been the site of Sherman Hospital in Elgin, Illinois. The site was designated earlier this year for use as a COVID-19 treatment center by the State of Illinois, and on information and belief, various government agencies invested $18 million to improve and outfit the site for the aforementioned use.

20.     At all  relevant times, JET Hospitals was a mere alter ego of FDG, formed by FDG's owners as FDG's designated vehicle for the purchase and operation of certain Illinois real estate which had previously been the site of Westlake Hospital in Melrose Park, Illinois. The site was designated earlier this year for use as a COVED-19 treatment center by the State of Illinois, and JET Hospitals seeks to purchase the site and lease it to the State of Illinois by way of a Court-ordered sale in the United States Bankruptcy Court for the Northern District of Illinois, Case No. 19 B 22878.

21.     At all relevant times, Star Realty was a mere alter ego of FDG, formed by FDG's owners for the purpose of brokering commercial real estate sales.

4

22.     On information and belief, since the inception of FDG and JET Park, respectively, Thomas (or a trust controlled by him) has been directly or indirectly the majority-owning Member of those companies.

23.     Since on or before October 18, 2018, Olswang has been the Registered Agent of both FDG and JET Park, at its above-shown principal office in Chicago, and on information and belief, Olswang has been functioning as President of those companies since on or before that date.

24.     Since on or before October 18, 2018, Olswang has been the Registered Agent of both FDG and JET Park, at its above-shown principal office in Chicago, and on information and belief, Olswang has been functioning as President of those companies since on or before that date.

25.     Since their formation, Olswang has also been the Registered Agent of both 901 Center and JET Hospitals, at their above-shown principal office in Chicago.

26.     FDG, JET Park, 901 Center, JET Hospitals, and Star Realty all have had the same principal office and the same registered agent at all times relevant to this complaint.

27.     Since on or before May 22, 2017, Thomas and Olswang have been the Managers of FDG and on information and belief Denkewalter has had various interests in FDG including a 30% ownership interest and manager's position at least through September 2018 and more limited ownership interest through the present day.

28.     Since on or before October 17, 2019, Thomas and Olswang have been the sole Managers of JET Park.

29.    On information and belief, since its formation, Olswang has been one of the two Managers of 901 Center, but Thomas has held a significant ownership interest therein and has exercised either a significant role or a controlling role in the management thereof.

30.    On information and belief, since its formation, Thomas has been the sole Manager of JET Hospitals.

31.    Since on or before June 23, 2019, Olswang was the sole manager of Star Realty, but on information and belief through September 13, 2018 Denkewalter had a 30% interest in Star Realty and on information and belief since September 13, 2018, 70% of the Membership Interests in Star Realty was owned by some combination of Olswang and the Cast Iron Trust, which on information and belief is either a fictitious name in which Thomas held ownership of Star Realty or was a trust of which Thomas was directly or indirectly the primary beneficiary.

32.    Consequently, on information and belief, at all relevant times, all the company Defendants in this suit were with varying degrees under the common ownership and control of FDG, Thomas. Denkewalter and Olswang, and JET Park, 901 Center, JET Hospitals, and Star Realty were all under common ownership and control of FDG and collectively referred to as "FDG controlled companies".

33.    Moreover, on FDG's website and on multiple public platforms, FDG represents itself as the central entity directing the other Defendant businesses.

34.    From the formation of FDG on May 22, 2017 until September 13, 2018 Denkewalter was a Manager and minority-owning Member of FDG. On or about September 13, 2018, Denkewalter resigned as Manager of FDG, and relinquished all but a 2% Membership Interest in FDG, a 30% Membership Interest in Star Realty, and 2.5% of FDG's

interest in Questar, Inc., pursuant to a written agreement with FDG, signed by Thomas on

FDG's behalf in exchange for hundreds of thousands of dollars.

## BACKGROUND/FACTS COMMON
## TO ALL COUNTS OF THE COMPLAINT

### Formation of FDG to Buy and Resale Real Estate

35.     On or about May 2017, while prisoners under the custody of the United States

Bureau of Prisons in Duluth, Minnesota, Plaintiff Hansen and Thomas and Denkewalter

(telephonically) agreed to form a corporate entity to purchase and resale real estate.

36.     Hansen had multiple conversations with Thomas and Denkewalter and a

contractual agreement ("Agreement") was reached wherein Hansen would secure financial

backing for the purchase and resale of real estate and Hansen would receive 25% ownership of

the corporate entity created and business ventures secured thenceforth; and additionally, Thomas

agreed to secure Hansen legal representation for Hansen's criminal case upon his release.

36.     From prison Hansen had several intrastate telephonic conversations with

Denkewalter, who guaranteed that Hansen's interest in the entity created would include a 25%

ownership interest for Hansen..

37.     To that end on or about May, 2017, Hansen, Thomas, Denkewalter agreed to the

formation of a business entity in which Hansen would have a 25% ownership interest,

Denkewalter would have a 25% and the other 50% would be under Thomas' control. The only

condition to their "Agreement" was that Hansen would secure a loan from his friend and

associate, Remily, in the amount of $100,000.00 to fund their business enterprises involving real

estate acquisitions.

38.     On information and belief, on May 22, 2017, Denkewalter, Thomas and Olswang formed FDG and in breach of the Agreement failed to include Hansen in the ownership of the entity.

39.     On or about May and June of 2017, Hansen and Thomas had numerous conversations between them while in prison and intrastate telephonically with Denkewalter about their first acquisition in interstate commerce, namely, to purchase and resale certain real estate located at 475-470 Market Ave. SW, Grand Rapids Michigan ("Grand Rapids property").

40.     Relying on Thomas and Dendewalter's representations that Hansen would be included in the ownership of FDG and all their future enterprises and investments, Hansen convinced his close friend, Remily to loan FDG $100,000.00 towards the purchase of their first business enterprise, the Grand Rapids property.

41.     On or about June, 2017, at Hansen's request, Remily agreed to loan $100,000.00 to FDG and Thomas signed a personal guarantee wherein Thomas and FDG guaranteed the repayment of the $100,000.00 plus 10% interest to Remily at the close of the Grand Rapids property or in one year whichever came first. See personal guarantee note attached hereto as **Exhibit "A"**.

42.     Relying on the Personal Guarantee and the Agreement between Hansen, FDG, Denkewalter and Thomas, at Hansen's request, on or about June 2017, Remily sent Denkewalter a check through the U.S. mail in interstate commerce from South Dakota to Illinois in the amount of $100,000.00 which Denkewalter subsequently deposited into his law firm's client trust account also known as their "IOLTA account". See check dated June 17, 2017 to Denkewalter attached hereto as **Exhibit "B"**.

43.     On information and belief, since FDG's formation in breach of their Agreement with Hansen, Denkewalter and Thomas failed to include Hansen in the ownership of FDG or in any of their subsequent failed or actual acquisitions.

44.     On information and belief, contrary to their Agreement, Denkewalter protected his own interests in the formation of FDG including himself in the ownership of FDG to the tune of 30% and including himself as manager of FDG and completely excluded Hansen from ownership or participation in FDG contrary to their agreement.

45.     Denkewalter and Thomas breached their personal guaranty to Hansen that he would be included in the ownership of FDG and their subsequent real estate acquisitions and investments when they failed to include Hansen in any of the ownership documentation of FDG.

46.     On information and belief the Grand Rapids business venture did not materialize; however, over three years have elapsed and FDG has not repaid Remily and FDG and Thomas are in default of their Personal Guaranty to repay Remily and owe Remily the principal amount of $100,000.00 plus 3 years of interest which is accruing.

47.     On information and belief since the formation of FDG in May 2017, Thomas, Denkewalter, Olswang and FDG and its various alter ego controlled companies all Defendants herein have engaged in various other business ventures to secure other properties which include the Parking Ramp and Ecolab building in Minnesota, and various other properties in the State of Illinois which include *inter alia* the Sherman Hospital in Elgin, Illinois and the Westlake Hospital in Melrose Park, Illinois and others properties and investments that can only be ascertained with specificity after appropriate discovery.

48.     FDG, Thomas and Denkewalter have breached their agreement to include Hansen in the formation and ownership of FDG and any and all of their subsequent acquisitions and investments named in paragraph 47 and others to be ascertained after discovery.

49.     Despite repeated requests to Thomas and Denkewalter seeking the repayment of Remily's loan with interest and compensation to Hansen for his share of the ownership in FDG, Thomas, Denkewalter and FDG have refused to honor their agreements with both Remily and Hansen.

50.     On information and belief, on or about January 25, 2018, FDG, Thomas, Olswang and Denkewalter were involved in another foiled interstate enterprise wherein Denkewalter convinced an associate, Michael Ziegler, ("Ziegler") to loan FDG $250,000.00 through a wire transfer transaction involving interstate commerce for an investment venture to purchase a parking ramp in Minnesota through another corporate entity namely, Jet Park,  who Denkewalter and Ziegler allege in a complaint they have filed against the Defendants named herein also alleging inter alia RICO violations which the Plaintiffs herein concur with. See complaint attached hereto as **Exhibit "C"** captioned ***Michael Ziegler and Kim Denkewalter v. Freedom Development Group***, LLC et al Case No. 1:20-cv-5013 ("Ziegler/Denkewalter complaint").

51.     The Denkewalter/Ziegler complaint alleges that FDG and their alter ego Defendants also named herein as Party Defendants have engaged in what constitutes a second wire transfer fraud in violation of the RICO statute and specifically allege that the Defendants named herein failed to pay their debt obligation of $250,000.00 plus interest to Ziegler and have failed to honor their obligations to Zenkewalter to pay him *inter alia* $250,000.00 pursuant to a buy-out exit agreement attached hereto as **Exhibit "D"** wherein Denkewalter surrendered his manager's position at FDG and transferred all but 2% of his ownership interest in FDG.

52. On information and belief and as is set forth in the Ziegler/Denkewalter complaint, Denkewalter resigned as manager of FDG on September 13, 2018 at which time Denkewalter relinquished 30% of his ownership interest in FDG for *inter alia* $250,000.00 with a provision wherein Denkewalter kept 2% ownership of FDG with a special provisions that required that FDG pay Ziegler his $250,000.00 loan with interest. *Id.* **Exhibit C.**

53. It is clear from the Ziegler/Denkewalter complaint that at all times since Denkewalter facilitated the loan from his associate to FDG, Denkewalter took many measures to protect his and Ziegler's interests including memorializing the arrangements to written documents, made various demands, retained attorneys and filed lawsuit to demand the repayment of monies FDG and the named Defendants owed him and Ziegler; however, on information and belief Denkewalter has not lifted a finger to protect and secure the repayment of monies owed to Remily and Hansen. *Id* **Exhibit C.**

## COUNT I - BREACH OF CONTRACT and PERSONAL GUARANTY
## (Claim by Remily)

54. Remily incorporates herein by this reference paragraphs 1 through 53, above.

55. Remily loaned $100,000.00 at the request of his friend and Associate Hansen to FDG on the condition that it would be re-paid with interest at the close of the acquisition of the Grand Rapids property or in one year whichever occurred first as memorialized in **Exhibit A.**

56 In order to ensure Thomas and FDG's compliance with the terms of the Agreement, Thomas executed a Personal Guaranty in which Thomas individually and as agent of FDG guaranteed payment of the debt due Remily when due.

57. Thomas and FDG have failed to pay the sums due under the Agreement and

11

Thomas and FDG have personally guaranteed payment and are liable to Remily for the sums due thereunder.

58.     Remily has been damaged by the aforesaid breach in the sum of $100,000.00, plus accrued interest at the rate of 10% from June 17, 2017 through the date of repayment.

59.     Remily has performed all conditions on his part entitling him to payment of the loan principal plus interest per the Agreement under **Exhibit A**..

WHEREFORE, Remily requests judgment against FDG and Thomas in the sum of $100,000.00, plus 10% interest through the date of payment; the imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums owed to Remily upon any interests in real property and business income acquired by the Defendants as a result of the lack of payment of monies owed Remily pursuant to the Agreement; and such other relief as the Court deems just and proper.

## COUNT II — CONVERSION

### (Claim by Remily)

60.     Remily incorporates herein by this reference paragraphs 1 through 59 above.

61.     Remily at all times since the Grand Rapids project failed to materialize or at the one year mark, Remily had an absolute and unconditional right to possession of the $100,000.00 with interest as provided under the Agreement.

62.     Remily has demanded that Denkewalter, Thomas, Olswang and FDG pay the debt due under the Agreement.

63.     Denkewalter, Thomas, Olswang and FDG directly or indirectly asserted dominion over and withheld from Remily payment due under the Agreement and directed that monies owed be fraudulently withheld, converted and expended on real estate

acquisitions and/or personal benefit to Defendants as will be determined and elaborated after discovery.

64.     The actions of Denkewalter, Thomas, Olswang and FDG were undertaken with malice and reckless disregard for Remily's rights.

WHEREFORE, Remily requests judgment against Denkewalter, Thomas, Olswang and FDG jointly and severally, for a sum in excess of $100,000.00; imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums owed to Remily, upon any interests in real property acquired by the Defendants as a result of the failure to pay monies owed Remily per the Agreement, and upon any income to the Defendants' businesses that resulted from the failure to pay of such money; punitive damages in an amount to be determined at trial; costs of suit; and such other relief as is just.

## COUNT III - BREACH OF CONTRACT
### (Claim by Hansen)

65.     Hansen incorporates herein by this reference paragraphs 1 through 64, above.

66.     Hansen promised to secure a loan of $100,000.00 to FDG on the condition that Defendants FDG, Denkewalter, and Thomas include Hansen in the ownership of FDG and all of their future real estate and investment acquisitions.

67.     In consideration of the foregoing promise, FDG, through Thomas and Denkewalter agreed to repay the principal sum of the loan, plus interest to Remily and other consideration as stated above which included a guaranty that Hansen would be included in the ownership of FDG and future acquisitions on an equal basis as Denkawalter each to acquire a 25% interest in FDG and its acquisitions.

68.     The initial terms of the loan agreement were memorialized in **Exh. A** hereto, which Thomas signed as FDG's agent with the approval of FDG's owners, Thomas, Denkewalter and Olswang and the terms of **Exh.A** are binding upon FDG.

69.     Pursuant to the Agreement FDG was to first acquire the Grand Rapids property which acquisition did not materialize; but, on information and belief the $100,000.00 loan secured by Hansen through his friend Remily provided the seed money for other failed and successful acquisitions including the aborted Parking Ramp in St. Paul and other actual successful acquisitions in Minnesota and Illinois.

70.     FDG breached the loan agreement, first by failing to pay Remily the loan principal with interest as provided in the Agreement and by failing to include Hansen in the ownership of FDG and their subsequent acquisitions.

71.     On information and belief, Denkewalter attempted to bail himself out of what appears to be a toxic relationship with FDG; but, not before protecting his own interest and that of his associate Ziegler through an exit agreement wherein he secured a promise that FDG  pay Denkewalter $250,000.00 for his interest in FDG among other concessions. See Denkewalter's exit agreement attached hereto as Id **Exhibit "D"**

72.     Neither Denkewalter, Thomas, Olswang, FDG or any of their alter ego creations have done anything to assure that either Remily or Hansen's interest were honored pursuant to the Agreements above mentioned.

73.     Hansen  has been damaged by the aforesaid breach in the sum of at least $250,000.00 which is the amount that was promised Denkewalter who like Hansen was to have an equal 25% ownership interest in FDG and its acquisitions.

74.     Hansen performed all conditions on his part entitling him to payment for his interest in FDG.

WHEREFORE, Hansen requests judgment against FDG, Dendewalter and Thomas, jointly and severally, in the sum of at least $250,000.00 plus interest and any income to the Defendants' businesses that resulted from the diversion of the loan secured by Hansen through his friend Remily; costs of suit; and such other relief as is just.

## COUNT IV - FRAUD
### (Claim by Hansen)

75.     Hansen incorporates herein by this reference paragraphs 1 through 74 above.

76.     At all relevant times Defendants, Thomas and Denkewalter were aware that Hansen was a prisoner of the US Bureau of Prisons with diminished capacity to assure that his rights pursuant to the Agreement were protected.

77.     Defendants failed to disclose to Hansen material facts contrary to their Agreement relating to the incorporation of FDG and its acquisitions.

78.     Defendants fraudulently and maliciously misrepresented through their acts or omissions the following material facts to Hansen:

a.     Failed to include Hansen in the ownership of FDG;
b.     Failed to include or inform Hansen of their subsequent failed acquisitions, namely, the Grand Rapids, Michigan property and Parking Ramp in St. Paul, Minnesota and the successful acquisitions of Sherman and Westlake Hospitals among other acquisitions.
c.     Negotiated an exit agreement with Denkewalter without informing Hansen and without any regard to Hansen's interest under the Agreement.
d.     Failed to disclose to Hansen any particulars relating to his position vis a vis ownership in FDG and FDG's business ventures and acquisitions.

79.     Hansen relied on Denkewalter's and Thomas' fraudulent and false misrepresentations, acts and omissions resulting in damages which included a fracture in

15

Hansen's friendship with Remily and the loss of substantial ownership interest in a corporate entity namely, FDG whose initial seed money on information and belief was derived from Hansen's efforts.

80.     Had Denkewalter and Thomas informed Hansen that he was going to be excluded from the ownership of the entity for which he was securing the seed funding, Hansen would have never persuaded his friend Remily to front the seed money for FDG and its investments.

81.     Consequently, Plaintiff has been prejudiced and damaged in the fractured friendship with Remily and the loss of his Property due to Denkewalter and Thomas' fraudulent and malicious misrepresentations, undue influence acts and omissions.

WHEREFORE, Hansen, requests that this Honorable Court render judgment in favor of Hansen and against Defendants, Denkewalter, Thomas and FDG in the amount of at least $250,000.00 plus interest and any income to the Defendants' businesses that resulted from the failure to re-pay the loan secured by Hansen through his friend Remily; punitive damages; costs of suit; and such other relief as the Court deems just and proper.

## COUNT V — BREACH OF FIDUCIARY DUTY
### (Claim by Hansen)

81.     Hansen incorporates herein by this reference paragraphs 1 through 80, above.

82.     As noted above, Denkewalter, Thomas and Olswang formed a corporate entity using Hansen's resources and then fraudulently excluded him from ownership in breach of their oral Agreement. Nevertheless although unnamed, Denkewalter and Thomas owed Hansen a fiduciary duty of good faith and fair dealing under the Illinois Limited Liability

16

Company Act (at 805 ILCS 180/15-3(g)(2) and (d)), which included a duty to keep Hansen informed of significant FDG business matters.

83.     In addition, under 805 ILCS 180/15-3(g)(2) and (b)(1), Denkewalter, Thomas and Olswang owed Hansen a duty to account and to hold as trustee for him, any property, profit, or benefit derived by them in the conduct of the company's business or derived from the use of the company's property.

84.     Denkewalter, Thomas and FDG never intended to include Hansen in the ownership of FDG or account to and/or partake with Hansen any of the benefits derived from ownership in the company and instead on information and belief misappropriated and misdirected FDG resources to benefit and unjustly enrich themselves.

85.     All the foregoing acts comprised oppression of Hansen as a fraudulently excluded member of FDG, as well as bad faith and unfair dealing toward Hansen for the unjust enrichment of Denkewalter and Thomas and on information and belief Olswang personally, all in violation of 805 ILCS 180/15-3(0(2), (d), and (b)(1).

86.     Hansen has suffered damages as a proximate result of the abovementioned acts and omissions, including loss of the value of his promised membership and ownership interest in FDG which should be measured calculated at least at par with the amount promised Denkewalter in his exit agreement as both were to have a 25% ownership in FDG which was valued per the exit agreement in excess of $250,000.00 as well as injury to his relationship with Remily.

87.     The actions of Denkewalter, Thomas, FDG, and Olswang were undertaken with malice and a reckless disregard for Hansen's rights.

WHEREFORE, Hansen requests judgment against Denkewalter, Thomas, FDG, and Olswang, jointly and severally, for damages in excess of $250,000.00; imposition of a constructive trust, proportionate to the contribution made by the withholding of the sums due and owing to Hansen, upon any interests in real property acquired by the Defendants as a result of such withholding, and any income to the Defendants' businesses that resulted from the diversion of such sums; punitive damages in an amount to be determined at trial; costs of suit; and such other relief as the Court deems just and proper.

### COUNT VI — VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

### FIRST CLAIM
### (Federal Civil RICO, 18 U.S.C. § 1962(c))
### (Against all Defendants except Denkewalter)

88.    Remily and Hansen incorporate herein by this reference paragraphs 1 through 87 above.

89.    Defendants violated RICO and Plaintiffs were injured as a result.

90.    Each Defendant is a "person" or "corporate entity" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

91.    Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

92.    The Enterprise. Defendants John Thomas, Daniel Olswang FDG, together with (I) the named alter ego Defendant corporate entities-controlled companies, (2) one or more former officers and former directors of FDG, (3) employees, officers and directors of FDG-alter ego controlled companies form an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the

meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may also be other members of the enterprise who are unknown at this time.

93. Alternatively, the FDG-controlled companies each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

94, Alternatively, the FDG-controlled companies together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

95. Each enterprise has engaged in, and their activities have affected, interstate commerce.

96. Pattern of Racketeering Activity. Defendants, each of whom are persons associated with, or employed by, the enterprise, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

97. Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts or else aided and abetted such acts.

98.     The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during a period of time beginning in approximately 2017 and continuing to the present, and there is a continued threat of repetition of such conduct.

99.     The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity. Rather, they existed separate and apart from the pattern of racketeering activity for the legitimate business purpose of buying, leasing and selling real estate. Defendants have had and do have. upon information and belief, legitimate business plans outside of the pattern of racketeering activity.

100.    Plaintiffs specifically alleges that. Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

101.    Predicate Act: Use of Mails and Wires to Defraud Defendants and others in Violation of 18 U.S.C. 1341 and 1343 . Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Remily, Hansen and others or to obtain money from Remily, Hansen and others by means of false or fraudulent pretenses, representations or promises. For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by wire transfer(s), U.S. mails or by private or commercial

20

interstate carriers, or received such therefrom. Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs and signals. The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

102.   Defendants carried out their scheme in different states and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires. In furtherance of their scheme alleged herein, Defendants communicated among themselves and with Plaintiff in furtherance of the scheme to defraud Plaintiffs. These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers

103.   Defendants; various above-described affirmative fraudulent misrepresentations, acts and omissions in breach of their oral Agreement with Hansen and written Agreement to Remily which provided that if Hansen secured funding from his friend and associate Remily, Hansen would be guaranteed an ownership interest in a business enterprise to acquire first, the Grand Rapids property in Michigan and then the Parking Ramp in Minnesota required and undertook the use of mail and wires transfers and communications across state lines — to acquire and divert funds acquired first from Remily in South Dakota and then from Ziegler in Illinois, refunds and sale proceeds from the Michigan and Minnesota foiled acquisitions, initiated from offices in Illinois, all with the intent and effect of defrauding Remily, Hansen and others and thereby producing losses and damages to Remily and Hansen above described.

21

104.    In addition, in furtherance of their scheme, Defendants used wire and/or U.S. mail or private or commercial carriers to induce Plaintiffs to execute the written agreements with Remily and Ziegler and other oral agreements including the oral and written agreements with Remily, Hansen, Ziegler and Denkewalter.

105.    Defendants also caused Plaintiffs and others to transmit thousands of dollars in funds by wire and the U.S. mail to Defendants which funds were ultimately converted fraudulently to their personal use.

106.    Defendants' shared objective was and is to divert funds to their own benefit and personal use.

107.    Plaintiff reasonably and justifiably relied upon Defendants' false representations, false pretenses and deceptive communications, and Plaintiffs have been damaged as a direct and proximate result of Defendants' participation in such enterprise, as alleged herein.

108.    Predicate Act: Transport and Receipt of Stolen Money in Violation of 18 U.S.C. §§ 2314 and 2315. Defendants committed acts constituting indictable offenses under 18 U.S.C, § 2314 in that having devised or intended .to devise a scheme or artifice to defraud Plaintiffs and others or to obtain money from Plaintiffs and others by means of false or fraudulent pretenses, representations or promises, Defendants transported or caused to be transported in interstate commerce money having a value of $5000 or more, which was stolen, converted or taken by fraud. Defendants also committed acts constituting indictable offenses under 18 U.S.C. § 2315 in that they received money in excess of $5000, which crossed a State or United States boundary after being stolen, unlawfully converted or taken. The acts of Defendants set forth above were done willfully

22

and with knowledge that the money was stolen, converted or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

109.    Upon information and belief Defendants also ensured that FDG, through the FDG-controlled companies, would receive money improperly siphoned from Plaintiffs and others while knowing that a portion of such money would be used for Defendants' personal use, to purchase hospitals and other properties.

110.    Plaintiffs have been damaged as a direct and proximate result of Defendants' illegal payments to purchase other properties without any accounting or credit towards Plaintiff's investment.

111.    <u>Continuity of Conduct.</u> Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiff and others, constituted a continuous course of conduct spanning a period from approximately 2017 to present, which was intended to obtain money through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

112.    Upon information and belief, Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

113.    The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs. Plaintiffs seeks an award of damages in compensation for, among other things, the thousands of dollars Defendants stole and diverted from Plaintiffs.

114.    As such, each of the aforementioned acts comprised mail and wire fraud in violation of 18 U.S.C. § 1343, and together they comprise an enterprise and a pattern of racketeering activity (including two or more mail and wire fraud violations within a 10-year period), with the consistent purpose and effect of financing and growing FDG's real estate and business enterprises with funds fraudulently obtained and misappropriated from Remily, Hansen and others, resulting in losses of at least $100,000.00 plus interest to Remily and potentially at least $250,000.00 to Hansen.

115.    As a consequence, the conduct of Thomas, Olswang and FDG described above constitutes a violation of the Racketeer Influenced and Corrupt Organizations Act, at 18 U.S.C. § 1962, entitling Remily and Hansen to a trebling of their damages and an award of attorneys' fees, all under 18 U.S.C. § 1964(c).

WHEREFORE Remily and Hansen request judgment jointly and severally against, Thomas, Olswang, FDG, and FDG'S-alter ego controlled companies receiving any of the funds due Remily and Hansen by any of the named Defendants, in the sum of at least $100,000.00 plus interest to Remily, $250,000.00 to Hansen, trebling of the sums indicated as to the Counts indicated above; plus attorneys' fees and costs of suit; imposition of a constructive trust, proportionate to the amounts made from the withholding of the sums owed to Remily and Hansen, upon any interests in real property acquired by the Defendants as a result of the failure to pay Remily and the amounts owed Hansen for his efforts in securing the start-up monies for FDG upon any income to the Defendants' businesses that resulted from the failure to repay Remily and due Hansen for his efforts per their oral Agreement; and such other relief as is just.

24

## SECOND CLAIM
### (Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d))
### (Against all Defendants except Denkewalter)

116.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

117.    In violation of 18 U.S.C. § 1962(d), the Defendants knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in paragraphs 88-116 above.

118.    The conspiracy commenced at least as early as 2017 and is ongoing.

119.    The conspiracy's purpose was to divert money from Plaintiffs and others to their own benefit and to facilitate the buying of hospitals among other properties with no accountability to Plaintiffs as investors and associates.

120.    Each Defendant committed at least one overt act in furtherance of such conspiracy. These acts in furtherance of the conspiracy included. misleading and excluding Plaintiffs as to the true purpose of their investment monies and the subsequent purchases of multiple assets without repayment of loans and accountability to joint venture and partnership agreements.

121.    Even if some of the Defendants did not agree to harm the Plaintiffs specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiffs was a reasonably foreseeable consequence of Defendants' actions.

122.    Plaintiffs have been injured and continue to be injured in their personal relations, business and property by Defendants' conspiracy in violation of 18 U.S.C. §

1962(d). The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs in its business or property. Plaintiffs seek an award of damages in compensation for, among other things, the thousands of dollars that Defendants diverted and stole from Plaintiffs. Plaintiffs further seeks an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

WHEREFORE Remily and Hansen request judgment jointly and severally against, Thomas, Olswang, FDG, and FDG'S-alter ego controlled companies receiving any of the funds due Remily and Hansen by any of the named Defendants, in the sum of at least $100,000.00 plus interest to Remily, $250,000.00 to Hansen, trebling of the sums indicated as to the Counts indicated above; plus attorneys' fees and costs of suit; imposition of a constructive trust, proportionate to the amounts made from the withholding of the sums owed to Remily and Hansen, upon any interests in real property acquired by the Defendants as a result of the failure to pay Remily and the amounts owed Hansen for his efforts in securing the start-up monies for FDG upon any income to the Defendants' businesses that resulted from the failure to repay Remily and due Hansen for his efforts per their oral Agreement; and such other relief as is just.

### Jury Trial Demand

Plaintiffs demand trial by jury on issues so triable.

Dated                                      DARREL REMILY and RANDAL HANSEN
                                           Plaintiffs


                                           By_____/s/ Juan M. Soliz_____
                                              Juan M. Soliz, Esq.


26

Law Office of Juan M. Soliz
3203 S. Pulaski Rd.
Chicago, IL 60623
Phone: 773-277-6155
Email: lawsoliz@sbcglobal.net
Attorney No. 3123126

27